UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA    )
   )    No. 19 CR 865-1
   v.        )
   )    Hon. Thomas M. Durkin
KATHRYN CHOI       )

**GOVERNMENT'S POSITION PAPER AS TO SENTENCING FACTORS**

Kathryn Choi was in her mid-20s when she worked as a senior analyst at Outcome Health. At the direction of Ashik Desai, she knowingly participated in a scheme to defraud Outcome's clients by fabricating inventory and production numbers. The length and magnitude of the fraud, and the losses that it caused, are substantial. On the other hand, Choi's relative culpability in that scheme is low. Desai was Choi's only boss until mid-2017 and Choi had no apparent contact with the higher-level participants. She obtained no financial share of the scheme apart from her usual salary. And she fully and truthfully cooperated during the investigation. The Probation Office and defendant both recommend a sentence of probation. The government has agreed in the plea agreement to make no recommendation as to a specific sentence.

I.    **Factual Background**

During the time period relevant to this case, Outcome provided point-of-care advertising services to pharmaceutical companies. Outcome's business model was to place television screens, tablets, and wallboards that displayed educational content into doctor's offices and then sell advertising space on those devices to pharmaceutical

companies. Rishi Shah founded Outcome in 2006, and Shradha Agrawal soon joined him as a co-founder. Ashik Desai was hired in 2013, eventually becoming Vice President of Business Growth and Analytics. Choi started working at Outcome in October 2014 as a senior analyst in the growth strategy group. Until about mid-2017, she reported directly to Ashik Desai.

As Choi admitted in her plea agreement, she was involved in several aspects of the fraud at Outcome, including (1) list matches and location lists; (2) tablets; and (3) concealment of the scheme from Outcome's outside auditor.

**List Matches and Location Lists**

One of Choi's responsibilities as a senior analyst in growth strategies was to conduct "list matches" to support the process of contracting with Outcome's pharmaceutical clients. Specifically, when negotiating a new contract with Outcome, pharmaceutical clients typically gave Outcome's salespeople a list of doctor's offices in which they wanted their ads to play. At Desai's direction, Choi provided inflated inventory numbers for those clients. In some instances, she only misrepresented the total available inventory that supposedly had matched against the client's list. In other instances, she responded with inaccurate lists of specific offices, identified by address, that had supposedly matched against the client's list. And, in still other instances, she misrepresented the number of high priority—or higher "decile"—offices that matched. Choi knew that these inflated list matches were to be used by

Desai and others to induce the clients to sign contracts with Outcome keyed to the misrepresented inventory number and type.

The result of the fraudulent list match process was that Outcome sold inventory it did not have. This created a number of problems, including under-delivering on campaigns while still billing the clients as if Outcome had delivered in full. Outcome under-delivered in several ways: (1) Outcome did not run the ads on the contracted number of screens; and (2) even when Outcome was running ads on the contracted number of screens or even above the contracted number, Outcome oftentimes was not running the ads in the correct offices, *i.e.*, for the offices "matched" during the list match process. Choi also came to learn over time that despite these routine under-deliveries, clients were typically still invoiced for the full number of contracted offices.

Also at Desai's direction, Choi concealed the under-delivery by creating "location lists" delivered to Outcome's accounting department and to clients, which lists were provided either as part of monthly proofs-of-performance or in response to specific client requests for purposes of conducting research on the advertising campaigns' effectiveness. These lists were supposed to identify the specific offices where the client's campaign was then running. However, Choi at times had to use the earlier list match results to create the location lists—*i.e.*, if a specific office had appeared in a list match it had to appear on the location list, even if Outcome did not have screens in that office and never ran ads for the client in that office. Otherwise,

3

the clients might have inquired as to why offices that had been "sold" to them did not show up in the list of offices where the campaign was supposedly then playing.

### Tablets

Tablets were interactive iPad-like products that were placed in exam rooms. Outcome had numerous problems with the tablets, including particularly large deltas, but continued to bill clients as if Outcome delivered in full on its contracts. Choi aided Desai in deceiving clients by sending them inflated engagement metrics regarding how frequently patients interacted with the tablets displaying clients' advertisements. Choi came to know that Desai and an analyst had inflated the tablet metric numbers in the past.

### Concealment from Outside Auditor

Outcome hired Deloitte to audit its financial statements for 2015 and 2016. As part of those audits, Deloitte requested data about some of the campaigns, including proof that Outcome had met its obligations under the contracts with pharma clients. Choi assisted Outcome's concealment of the under-delivery on those contracts. Specifically, at Desai's direction, Choi misrepresented some location lists to give to Deloitte to make it appear that Outcome had satisfied its obligations when it had not in fact done so.

For example, on February 26, 2016, Choi emailed Desai, saying, "Know some programs may have been at 50% so we'd probably need to backfill those," by which Choi meant that Outcome needed to provide lists to Deloitte misrepresenting where

devices had been playing. Specifically, Desai (after consulting with Purdy) directed Choi to "backfill" those deltas by adding numerous device IDs of tablets or TVs to the lists for the auditors when, in fact, ads did not run on those devices. Choi followed those directions. The concealment was successful, and Deloitte signed an audit opinion letter for the 2015 audit. The same process also played out for the 2016 audit.

## II.     The Advisory Sentencing Guidelines Range

The government believes that the advisory Guidelines calculations set forth in Choi's plea agreement are correct. Nevertheless, the government understands that the Court's rulings on contested sentencing enhancement issues during the sentencings of the defendants in the related case apply equally to Choi. Given those prior rulings, the government does not seek to relitigate those issues at Choi's sentencing. As such, the calculation of Choi's advisory Guidelines range is as follows:

| | |
|---|---|
| Base offense level (U.S.S.G. § 2B1.1(a)(1)(2)) | 6 |
| Loss of more than $9.5 million but less than $25 million (U.S.S.G. § 2B1.1(b)(1)(K)) | 20 |
| Ten or more victims (U.S.S.G. § 2B1.1(b)(2)(A)(i)) | 2 |
| Zero-point offender reduction (U.S.S.G. § 4C1.1(a)) | -2 |
| Acceptance of responsibility | -3 |
| **Total** | **23** |

With an adjusted offense level of 23, and no criminal history points, defendant's advisory Sentencing Guidelines range would be 46 to 57 months' imprisonment.

### III.    Motion Under § 5K1.1

Choi has provided full and truthful cooperation with the government during its investigation of this matter. Although the government did not call Choi as a witness at trial, her cooperation was nonetheless sufficient to warrant a motion under § 5K1.1. Thus, as provided in the plea agreement, the government moves the Court to depart downward from the low end of the Guidelines range. Also as provided in the plea agreement, the government makes no recommendation regarding the sentence to be imposed.

### IV.    Application of § 3553(a) Factors

As part of the sentencing process, the Court is to consider the factors set forth in 18 U.S.C. § 3553(a), and impose a sentence that is sufficient, but not more than necessary, to achieve the goals of sentencing. The relevant § 3553(a) factors in this case include: (1) the nature and circumstances of the offense; (2) defendant's history and characteristics; (3) the need to reflect the seriousness of the offense, to promote respect for the law, to afford adequate deterrence, and to provide just punishment for the offense; and (4) the need for restitution.

#### A.    Nature and Circumstances of the Offense

Choi served a significant role in assisting Desai in the scheme to defraud Outcome's clients out of millions of dollars. As detailed in sentencing memoranda filed in the related case, this was not a run-of-the-mill corporate fraud case where a corporate employee took advantage of a singular opportunity to reap extra profit from

6

a small number of transactions. Nor was it one of those cases where a small fly-by-night company was operating as the alter-ego of its fraudster owner. Instead, defendant assisted in a fraud scheme that was planned and orchestrated by the founder and chief executive officer of a legitimate and substantial (albeit relatively new) player in the point-of-care advertising industry. The scheme was designed to accelerate the company's growth through fraudulent sales. Choi's assistance of Desai's fraudulent acts was significant to the scheme's success. This was not a one-time lapse in judgment on her part, but an overall course of action that she knew to be deceptive and injurious to the victims.

In mitigation, defendant's culpability relative to the defendants in the related case is low. She was levels removed from the executive management of the company who created and carried out the scheme. Indeed, it does not appear that defendant had any direct involvement with those defendants—but instead took her direction from Desai. Moreover, unlike other defendants, Choi did not receive any significant remuneration for her participation, as opposed to her normal salary—certainly nothing like the tens of millions of dollars obtained by Shah and Agarwal.

## B. Defendant's History and Characteristics

Choi was in her mid-20s when she participated in this offense. That youth is mitigating, as is her lack of any other misconduct. On the other hand, nothing about her personal background satisfactorily explains her knowing agreement to participate in the fraud scheme. Indeed, as the Court learned at trial, multiple other

7

Outcome employees, including analysts like defendant, resigned from Outcome soon after learning that they were being asked to help advance that scheme. In contrast, Choi presumably acquiesced to her role in the scheme because she valued her employment with Outcome and the career and financial opportunities it presented, and likely due to her trust in and deference to others in the company.

### C. General Deterrence

The need to afford adequate deterrence to others is a critical part of the sentence to be imposed in this case. That is especially true in corporate fraud cases, where the fraud can be difficult to detect and prove, yet lucrative to certain participants. Thus, it is important that sentences in this and other fraud cases serve to deter individuals from committing the same crime. *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); *United States v. Brown*, 880 F.3d 399, 405 (7th Cir. 2018) ("endors[ing] the idea that white-collar criminals act rationally, calculating and comparing the risk and the rewards before deciding whether to engage in criminal activity. They are, therefore, prime candidates for general deterrence.") (internal quotation marks and citation omitted).

Nevertheless, the need for general deterrence decreases with less culpable defendants, particularly those at the lower end of the corporate hierarchy. While it is

important to deter even the least culpable of criminal participants, such deterrence can be achieved through charges and convictions of those participants and the collateral consequences of those convictions, along with significant custodial sentences of the more culpable participants.

Here, the defendants in the related case were sentenced as follows: Shah to 90 months' imprisonment; Agarwal to 1 day in custody and 36 months in community confinement; Purdy to 27 months' imprisonment; and Desai to 7 months' imprisonment. As noted above, the plea agreement provides that the government will make no recommendation regarding defendant's sentence. The Probation Office and defendant have each recommended a sentence of probation.

## V.     Conclusion

For the reasons stated above, the government moves for a § 5K1.1 downward departure and makes no recommendation as to defendant's specific sentence, but notes that defendant's conduct is significantly less culpable than any of the defendants in the related case.

Respectfully submitted,

MORRIS PASQUAL
Acting United States Attorney

By:     /s/ *Corey B. Rubenstein*
JASON A. YONAN
COREY B. RUBENSTEIN
Assistant U.S. Attorneys
219 South Dearborn St., Rm. 500
Chicago, Illinois 60604
(312) 353-0708